UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MMG FINANCIAL CORP.,

        Plaintiff,

v.                                      Case No. 06-C-929

MIDWEST AMUSEMENT PARK, LLC, et al.

        Defendants.

**DECISION AND ORDER**

Plaintiff MMG Financial Corporation ("MMG") commenced this action against Midwest Amusement Park, LLC, ("Midwest") asserting claims for breach of contract and unjust enrichment arising out of an arrangement under which MMG was to finance Midwest's purchase of two-dozen go-karts for its racetrack in Shawano, Wisconsin.[1] Midwest denied liability on MMG's claims and filed its own counterclaims for breach of contract and breach of express and implied warranty. Midwest claims that MMG had failed to make the agreed payments to the seller and thereby damaged Midwest's business. Midwest also claims that the go-karts and a separate program for go-karts that Midwest also purchased with MMG's financing did not meet the express and implied warranties that arose out of the transaction. The case is before me on MMG's motion seeking judgment on the pleadings or summary judgment as to the defendant's counterclaims. MMG further

---

[1] In its Second Amended Complaint MMG added claims against the Dr. R.C. Samanta Roy Institute of Science and Technology ("SIST"), alleging that SIST, as the alter ego of Midwest, fraudulently transferred the land on which its racetrack is located to U.S. Acquisitions and Oil, Inc., who is also named as a defendant. The motions now before the court do not concern these claims.

asserts that discovery abuses, including the destruction of key evidence, support entry of judgment against defendant Midwest Amusement on MMG's own claims. For the reasons that follow, MMG's motion for summary judgment on Midwest's counterclaims will be granted, thereby rendering moot its motion for judgment on the pleadings, and its motion for sanctions will be denied.

**BACKGROUND**

The case arises out of what all parties must concede was an unusual three-way transaction. The defendants decided to purchase the go-karts at issue for their Shawano racetrack from a Canadian company called Cameron Motorsports after an encounter at a trade show. In early 2005, a meeting held in Shawano was attended by several of the defendants' representatives as well as both a Cameron Motorsports representative, Loren Kelly, and the president of plaintiff MMG, Malcolm McMaster. The parties discussed Cameron's go-kart offerings and someone suggested that MMG could finance the transaction. Soon after the meeting, defendant Kal Gronvall, who operates the Shawano racetrack, ordered 24 karts from Cameron Motorspots. The karts were apparently branded and sold by Cameron but manufactured by an Italian company called CRG.

The financing aspect of the transaction occurred soon after, although strangely it did not seem to involve Cameron at all. MMG and Gronvall orally agreed on financing the roughly $90,000 purchase at a rate of 2% a month over 24 months. The rate was later dropped to 1.5% per month after Gronvall objected.[2] By August 2005, these arrangements were still oral and apparently in

---

[2] There is a suggestion that the racetrack's ownership typically financed large transactions but then paid them off very quickly, which might account for the unusually high interest rates.

2

some state of uncertainty, however, and another round of negotiations occurred regarding the financing. The parties ultimately agreed that in lieu of standardized monthly payments, MMG would take fifty percent of the racetrack's revenues during the six months of the year that it operated. This agreement was memorialized in a single page signed by Gronvall. (McMaster Decl., Ex. D.) The agreement lists the "dealer" as "Team Hurricane Inc.," which is apparently an entity owned at least in part by Cameron Motorsports, and MMG Financial is listed as the finance company. Based on this agreement, MMG expected to receive payments for revenues the racetrack generated in the months of August, September and October in 2005. By June 2006, however, when this lawsuit was instituted, MMG had not received any payments whatsoever. The allegations underlying Midwest's counterclaims are set forth below.

## ANALYSIS

**I. Motion for Summary Judgment**

MMG asserts that Midwest's counterclaims for breach of contract and breach of express and implied warranties are defective as a matter of law and should be dismissed on the basis of the pleadings alone. As discussed below, however, the relief MMG seeks is more akin to summary judgment and it is also seeking relief on that basis. MMG asserts that Midwest has failed to offer any evidence of damages and further asserts that the basis for the breach of contract claim is "false." As to the warranty counterclaims, MMG asserts that it does not own either of the entities (Team Hurricane or Cameron Motorsports) that sold the allegedly defective products to Midwest, and therefore it cannot be liable for any warranty-type claims Midwest might have. In addition, it asserts that even if there were some estoppel-based theory upon which MMG could be liable, Midwest has

3

failed to join either Team Hurricane or Cameron Motorsports, joint obligors who are required to be joined under Fed. R. Civ. P. 19(c).

**A. Breach of Contract**

Midwest's breach of contract counterclaim asserts that MMG never actually paid Cameron Motorsports for the karts it "financed." Because Cameron delivered the karts to the racetrack yet subsequently was not paid, Midwest asserts, Cameron ultimately refused to provide adequate service for the karts. This lack of service allegedly caused Midwest significant damages.

The sole evidence Midwest offers to support its assertion that MMG never actually paid Cameron Motorsports for the karts, however, consists of correspondence and other hearsay from Cameron or its representatives. By way of example, Midwest offers an October 12, 2005 letter it received from Bob Cameron of Cameron Motorsports. (Dkt. # 55, Coley Aff., Ex. A-3.) Evidently Cameron viewed Midwest not only as an end-user of the go-karts but also as a potential distributor and business partner of Cameron Motorsports. Cameron's letter was an effort to explain its business strategy in developing partners for distribution, and it is clear that Cameron was somewhat frustrated by the fact that it had not been paid for the go-karts, as well as frequent service calls Midwest made to Cameron. Cameron was also upset about a complaint Midwest had made to CRG (the karts' Italian manufacturer) about the service provided by Cameron. The essence of the letter suggested that in order to move forward with their business relationship, Cameron wanted Midwest to step up to the plate with additional future go-kart orders and invest in a functional service department. Not surprisingly, Cameron was not interested in becoming partners with a company that had little service ability of its own and did not apparently have much inclination to invest in the relationship itself (as Cameron saw it). The letter concluded:

4

> On one final issue, we have on many occasions spoken of the financing arrangements in place with MMG financial. I am not in possession of any documentation that supports this arrangement. The fact of the matter remains that I have not received any payment from any source for the product that you have received. I have offered assistance to you in clear written form above, and now am requesting your assistance in providing me with verification of your financing arrangement with MMG Financial. If in fact you are financed with them, I am prepared to deal with them directly on your behalf to secure payment for my shipment to your organization.

(*Id.* at 3.) Midwest claims that similar assertions that it had not been paid were made by other representatives of Cameron. Because Cameron had apparently not been paid by MMG for the go-karts, Cameron supposedly stopped servicing Midwest's karts and precluded it from buying the right parts. These actions allegedly led to Midwest's damages and form the basis of Midwest's breach of contract claim.

But because Cameron's letter and the alleged assertions of nonpayment made by its representatives are hearsay, they may not be considered in determining a motion for summary judgment. Affidavits in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial.") None of the evidence offered by Midwest in opposition to MMG's motion meets this standard.

Midwest attempts to remedy this difficulty by challenging the weak documentation of payment McMaster provided at his deposition and the apparent difficulty he had explaining it in the course of his testimony. (Def.'s Br. In Opp. at 2.) But McMaster clearly testified that he paid Cameron for the go-karts, and the sales receipts attached to his declaration appear to confirm the fact. (Dkt. # 55, Coley Aff., Ex. A at 67; Decl. of Malcom M. McMaster, Ex. A.)

5

More importantly, it is not MMG's burden to prove its claim in order to prevail on its motion for summary judgment on Midwest's counterclaim. In the face of a properly supported motion for summary judgment, the party carrying the burden of proof at trial on a claim cannot simply poke holes in the moving party's evidence. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) ("When as in the present case a defendant moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of his claim, the plaintiff is required by Fed. R. Civ. P. 56, if he wants to ward off the grant of the motion, to present evidence of evidentiary quality-either admissible documents or attested testimony, such as that found in depositions or in affidavits-demonstrating the existence of a genuine issue of material fact."). Here, Midwest has failed to put forward any admissible evidence on an essential element of its claim – that MMG failed to pay.

It is not as if the missing evidence, if it exists, would have been difficult to gather. One would assume that, if in fact Cameron had not been paid for the go-karts, its owner or representative would have been more than willing to state as much under oath in an affidavit or declaration. Presumably, the company wants to be paid. Midwest offers no such evidence. Nor does it contend that it is in need of additional time to obtain such evidence. Such an argument, had it been presented, might warrant relief under Rule 56(f), which allows the court to deny the motion or allow additional time to respond before ruling. No such request was made here.

6

I conclude, from the absence of admissible evidence to support its claim that MMG breached the financing agreement by failing to pay Cameron, that Midwest has none to offer. This is fatal. Summary judgment is, after all, "the 'put up or shut up' moment in a lawsuit." *Johnson v. Cambridge Industries, Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). Having failed to "put up" such evidence, Midwest's claim for breach of contract must be dismissed.

**B. Breach of Warranty**

Midwest's other counterclaims assert breach of warranty. In short, they assert that Team Hurricane Inc., an entity that Midwest alleges is "co-owned" by the plaintiff, failed to deliver a program called "Arrive and Drive" and that the go-karts themselves were not in merchantable condition. Generally speaking, "Arrive and Drive" is a program in which the racetrack owns and services the go-karts and allows the public a no-hassle way to lease or rent them for use on the track.

The plaintiff's defense is quite simple: it does not have any ownership interest in an entity called "Team Hurricane." It is merely the finance company for the transaction at issue, and as such it cannot be somehow liable in any of the defendants' various warranty claims any more than a mortgage company or bank would be liable to a home purchaser for that home's defects.

Midwest argues that McMaster gave the impression that MMG was a co-owner (with Cameron Motorsports) of Team Hurricane. At various points in his deposition, McMaster does suggest that the original plan was that MMG was going to be a co-owner, and it is clear that MMG at one point had a closer relationship with Cameron Motorsports than it does now. (Dkt. # 55, Coley Aff., Ex. A-1.) But nowhere is there any basis to conclude that MMG has any ownership interest in the entity known as Team Hurricane Inc., the defendants' assertions to the contrary.

7

Moreover, I note that Team Hurricane Inc. is alleged to be a corporation in its own right. The defendants provide no reason for why MMG would be liable for that corporation's liabilities merely because it is alleged to be a "co-owner" of that corporation.

Midwest also makes a strained argument invoking Article 3 of the Uniform Commercial Code and the holder in due course rule. Wis. Stat. § 403.302(1). Midwest notes that MMG Financial is not a holder in due course of the very instrument it negotiated with Midwest. That much is obvious. But because MMG was not a holder in due course, Midwest argues, it had "notice" of all of Midwest's problems, including defects in the go-karts. Thus, because MMG was aware of certain problems relating to the go-karts, Midwest is entitled to bring a warranty claim as a set-off against its debt to MMG, even though MMG was not the seller of the defective go-karts.

The argument is without merit. First of all, Article 3 of the UCC deals not with sales, but with negotiable instruments. There is no negotiable instrument in this case. Furthermore, warranties arise as a result of transactions between a buyer and a seller. *See* Wis. Stat. §§ 402.13, 402.14, 402.15. MMG was neither. It financed the transaction, and it did so before any alleged problems with the go-karts emerged and before any alleged performance issues related to the "Arrive and Drive" program came to light. Given the timing of the transaction, it makes no sense to suggest, as Midwest does, that it can somehow reduce the amounts it owes a finance company merely because the finance company later becomes aware of problems related to the financed goods. Moreover, even if MMG was aware of certain problems going into the deal, Midwest has provided no authority for the principle that a lender is somehow subject to setoffs against principal based on the purchaser's satisfaction with the product financed. What third-party lender would lend money if the borrower could refuse to honor his financing obligations on the basis that the goods were

8

defective? The lender assumes the risks inherent in *lending* – default in payment, devaluation of collateral, changes in interest rates, and the like – but it does not generally assume the warranty bundle of risk, both for economic reasons and for the more practical reason that any product warranty is the seller's, rather than the lender's, to give. In sum, I can conceive of no plausible basis upon which to hold MMG Financial liable for any warranty claims that may or may not exist based on go-karts or racing programs sold to the defendants by an entity known as Team Hurricane. These counterclaims will therefore be dismissed.

**II. Judgment as a Sanction**

In addition to seeking judgment on Midwest's counterclaims, MMG asks this court to enter judgment against Midwest as a sanction for its conduct in discovery. According to its reply brief, MMG has withdrawn one of its objections to Midwest's conduct on the basis of an agreement the parties have reached. It still seeks sanctions, however, on the grounds that Midwest deliberately destroyed relevant evidence.

As noted above, the operative finance agreement between the parties required Midwest to pay for the go-karts as a percentage of its revenues during its operating months. There is a crucial dispute, however, as to which revenues were to be the benchmark for repayment: in the plaintiff's view, it is *all* revenues Midwest received at the racetrack, in which case Midwest had sufficiently robust revenues (more than $500,000 per year) to repay the entire loan. In the defendants' view, however, repayment was based solely on revenues received through the track's "Arrive and Drive" program. The defendants allege that this program only had revenues of some $28,000 in 2006. The single page memorializing the agreement does not resolve the dispute: it merely says that "Malcolm McMaster of MMG Finance Corp. agreed with Bruce, Roger and Kal of USA International Raceway

9

to base the monthly payments at the end of the season on 50% of revenue taken in the months of August, September, and October, 2005." (McMaster Decl., Ex. D.)

Plaintiff notes that in the event a jury accepted the defendants' theory that "revenue taken" meant only "Arrive and Drive revenues," those specific revenue figures would be directly relevant to the question of damages, i.e., how much Midwest is in default on its obligation to repay MMG. The plaintiff states, however, that it has had no luck trying to obtain from Midwest specific monthly revenue figures for the Arrive and Drive program. Specifically, although Midwest's *overall* revenues have been provided, Midwest's witnesses were unable to provide any detailed revenue information broken down by month or by the various programs it ran. The plaintiff further asserts that Midwest has systematically destroyed "daily income sheets," which were the only data that formed the basis of the compiled financial information Midwest did provide. By destroying this raw data, Midwest eliminated the ability for anyone to track its revenues on a monthly and program-by-program basis. MMG asserts that there is thus no evidence of Arrive and Drive revenues, and it should not have to take Midwest's own word for those figures in the event a jury accepts Midwest's version of what the contract requires.

First, it seems that the absence of *monthly* statements is of little moment. Whether broken down by month or year, the important point now is simply the total revenues generated, whether from the racetrack as a whole or through the Arrive and Drive program specifically.[3] This is, in fact, what the agreement spells out. (McMaster Decl., Ex. D.) (requiring "monthly payments at the end of the season.") The real problem is the absence of data supporting revenues generated specifically

---

[3] Monthly information would have been pertinent to Midwest's original obligation to pay the debt on a monthly basis, but we are well beyond that point now.

10

by the Arrive and Drive program. Midwest states that it has provided a 2006 financial statement that shows $28,411.50 in revenues for that program, but it has not apparently provided any 2007 information on the program. It has provided other financial information about its profits and expenses, but not on a program-by-program basis.

Regarding the destruction of evidence, I do not find anything in the record that would warrant sanctions for egregious conduct. It appears that a Midwest employee named Scott Paape typically made handwritten notes and collected receipts on a daily or weekly basis, but only the totals were kept rather than the underlying records. (Dkt. #52, Ex. F.) Although the plaintiff's frustration with Midwest's record-keeping is understandable, I cannot conclude based on the sparse record before me that Midwest's practice of throwing away certain records was egregious and sanctionable conduct.

That said, it does appear that Midwest lacks any documentary evidence to support its revenue statement. The 2006 financial "statement" it has provided – the only one that specifically sets forth the revenues of the Arrive and Drive program – is less than a half-page in length and does not resemble any kind of standardized business document. (Dkt. #52, Ex. C at 7.) It simply lists "gross revenues" of $28,411.50 and certain other "expenses" due to kart repair (the basis for Midwest's counterclaims). The other financial information Midwest provided is more detailed, but it does not suggest any basis for attributing any revenues to the Arrive and Drive program in particular.

Midwest protests that it is a subsidiary of a non-profit corporation and lacks an accounting department, and, as a more general matter, it should be entitled to do business and keep books in any way it sees fit. Although that is perhaps understandable in the abstract, it is not plausibly

11

consistent with its claim that it was entitled to repay its loan only out of a certain stream of revenues. It makes little sense to agree to a payment program based on a discrete stream of revenues and then fail to keep any records of that revenue stream. After all, Midwest was the only party who would be able to compile such information, and it could not reasonably expect that its lender would agree to accept without question whatever undocumented figure Midwest claimed. This is especially true when it was clear that the revenues claimed were so low. If Midwest was truly only obligated to repay half of its stated revenues of $28,411.50 ($14,205.75), that payment would barely even cover the 12% *interest* on the $90,000 balance. At that rate, repayment of the loan would take a decade or more. Given this unlikely scenario, I do not find Midwest's defense that it was an unsophisticated non-profit entity to be compelling.

Put another way, to the extent Midwest believed it was entitled to repay the loan based on a discrete stream of revenues that were within its sole knowledge, Midwest was under some sort of obligation to keep records of that revenue stream rather than just appear years later with a summary document that has no independent evidentiary support of its own. Moreover, the fact that the agreement itself mentions only "revenue taken" rather than "revenue taken by the Arrive and Drive program" is of great significance, for such an omission casts substantial doubt on Midwest's version of events. Midwest's failure to retain such evidence is not a basis for sanctions, but it is certainly a reasonable basis for rejecting Midwest's construction of the agreement. It hardly makes sense that Midwest would agree to repay the loan by paying a percentage of the revenue derived from Arrive and Drive, and then fail to maintain the records needed to substantiate what that revenue is. Assuming MMG is able to conclusively establish that it made the payments it promised, it may be in a position to seek summary judgment on that basis. But that is not the motion before me now.

12

Based on the record as it now stands, I find no basis for entering judgment against Midwest as a sanction. Accordingly, MMG's motion will be denied.

For the reasons given above, the plaintiff's motion for summary judgment is **GRANTED** and the defendants' counterclaims are **DISMISSED**; the motion is **DENIED** with respect to the motion for judgment as a sanction.

**SO ORDERED** this   2nd   day of April, 2008.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
